Judge Owsley
delivered the opinion of the court.*
This is a contest under adverse claims to land. The appellees derive title under the junior patent, but assert the *414 superior equity under an entry made the 2d March, 1784, for 12,311 acres in the name of Isaac Halbert, &c. and the appellants rely, not only on their elder title, but insist upon the validity of the entry under which they claim, made prior to that of Halbert, &c for 5000 acres in the name of Samuel Haws.
An entry calling for a creek by a certain name, known while it is known to many by another name, is yet contains other calls which would lead an enquirer certainly to the creek.
The court below pronounced a decree against the validity of the entry of Haws, and supporting that in the name of Halbert.
In reviewing that decree, as the appellees were complainants in that court, it is proper we should first examine the validity of the entry of Halbert, &c. under which they claim— it is in the following words:
“2d March, 1784—Isaac Halbert, Richard Ratcliff, Henry Gunnell, Robert Gunnell, William Gunnell and Charles Morgan, assignees, &c. enters 12,311 acres of land on six treasury warrants, No. &c.; each to hold in proportion to the quantities mentioned in said warrants—beginning at the junction of the fork of Hinkston’s fork, and the first fork that empties into Hinkston on the north side below the mouth of Flat Lick creek, commonly known by the name of Clement’s fork of Hinkston, and runing from thence north, 1400 poles; south 330 poles; thence from each end of said line off 1730 poles east, so far as will be sufficient to include the quantity."
A survey was made upon this entry, beginning upon the fork of Hinkston at the mouth of a fork called called Brushy fork, or Clement’s fork, and described upon the connected plat as the first fork of Hinkston, emptying in on the north below the mouth of Flat lick creek.
There appears from the evidence to be a contrariety of opinion as to the name by which the fork, at the mouth of which the survey commences, was known at the date of Halbert’s, &c entry—some of them calling it the Brushy, others Clement’s, and others again Fleming’s fork; but it cannot be material by which of those names it was called, or whether by either; for, at the date of the entry, Hinkston and the Flat lick creek had assumed great and general notoriety, and from the description contained in the entry, it would be impossible for an enquirer to doubt of the junction, formed by the entrance of the fork in Hinkston, at which the survey commences, being the one intended—Assuming the entry of Halbert, therefore, to be sufficiently established, we are next led to examine that under which *415 the appellants claim. It is as follows:—“December 3, 1782—Samuel Haws enters 5000 acres of land on part of a treasury warrant, No. &c. beginning at a large ash tree, marked I C, standing on the buffaloe road leading from Grant’s station to the Lower blue licks, about 5 or 6 miles from said licks, thence to run N E, 640 poles; thence from the said tree S. W. 640 poles; thence S. E. at right angles from the extreme of each line, and to exclude Richard Bullard’s entry of 1000 acres, Bennet Pemberton’s 300 acre entry, and John Skaith’s 200 ”
An entry containing a defective description can only be aided by the great notoriety of the object called for.
This entry was subsequently surveyed by commencing at a large ash tree marked I C, eight and three fourth miles from the Blue licks on a direct line, and ten miles and forty-three poles from the licks pursuing the course of the buffaloe road to Grant’s station.
The Blue lick, Grant’s station, and the buffaloe road passing from the one to the other, is proven to have been generally known at the date of the entry; so that in deciding upon the validity of Haws’ entry, it is material barely to enquire what effect is produced upon it, by the marked tree standing at the distance of upwards of ten miles from the licks, instead of five or six, as described in the location.
Assuming the tree not to have obtained notoriety, and the distance at which it stood from the licks, not to have been generally computed to be five or six miles at the date of the entry, the mistake in the description of distance, would most clearly be fatal to its validity, for although a mistake in description,or a defective description maybe aided by the notoriety of the object called for; in the absence of proof of notoriety, an entry deficient in description,cannot furnish information sufficiently certain to others of the land intended to be located as to be deemed a valid appropriation.
An enquirer with the entry of Haws before him, and desirous of locating the adjacent residuum, and being unable to derive any aid, either from the notoriety of the marked tree, or the computed distance from the licks, would little expect that by entering the land now in contest, he would conflict with the entry of Hawes.
If by travelling the road or otherwise, he should have acquired even a reasonable knowledge of the country, he would suppose that the tree called for by Haws, must be several miles nearer the licks; and if not, willing to. rely upon his conjectures as to distance, he should take the trouble *416 of ascertaining by actual admeasurement, he would necessarily find his conjectures to be correct; or if he possessed no other knowledge of the country, than should be implied from the notoriety of the road, station, and licks, and should commence his search at the licks, he would soon learn that the distance of five or six miles, would terminate several miles before he would reach the land in contest; or if, as was contended in argument be should commence his search at Grant’s station, being the point most contiguous to the settled part of the country, he must ultimately arrive at the same result. In pursuing the trace from the station, it is true, as the ash tree is proven to have been plainly marked, be might by turning his attention particularly to the examination of the trees on the road, discover the marked tree, but if he were acquainted with the distance from the licks, he would reasonably conclude that from the difference in distance it could not be the tree called for in the entry; or if not acquainted with the distance, as an ordinarily prudent man would endeavor by further examination to ascertain it. Whether, therefore, possessed of a knowledge of the distance from the licks, or not, the enquirer after discovering the marked tree, would naturally be induced to continue his examination, and by pursuing the road, be would arrive at another ash tree, marked I. C. five miles and 76 poles only, from the lick. This tree, it is true, he would find to be smaller than the other, and marked with the letters J. C. instead of I. C. described in the entry; but although smaller, he would discover it to be about two feet through, and although marked with different letters, yet by adverting to the coincidence in distance from the licks called for in the entry; he might as rationally infer a mistake in the letters called for on the tree, as in the distance from the licks.
Under these circumstances, therefore, the entry of Haws, cannot be admitted to contain the requisite certainty of description, and consequently cannot be sustained unless the mistake in distance can be aided by the notoriety of the tree marked I. C. or the computation of distance from the licks, at the date of the entry.
We think, however, that neither the evidence in relation to the tree nor the computation of distance can give validity to the entry.
Several witnesses prove that they knew the tree before the date of the entry, and some of them speak of it as tho’ *417 they supposed it to have acquired something like notoriety, but there are many others, who seem to have had a knowledge in that part of the county, speak negatively of their having neither known or heard of it; and although in some cases negative evidence is entitled to but little or no weight, yet in questions of notoriety, which depend upon the general knowedge of those conversant in the vicinity, negative evidence deserves as high consideration as affirmative.
In questions of notoriety, negative testimony of those conversant in the vicinity is of great weight. Vide ante, Banta’s heirs vs. Clay, ac.
Bibb for appellants Hardin for appellees.
And with respect to the computation of distance from the licks, at the date of the entry, it need only be remarked, that although the ash tree appears to have been supposed by some, not to be more than about five or six miles from the licks, the evidence is by no means sufficient to prove a general understanding, or computation of the distance; some of those in company when the entry of Haws was made speak of Hinkston’s fork being called about nine miles from the lick, and say they supposed the tree to be about three miles from the fork, towards the licks; but Col. Johnston, who seems to be one of the principal locators, says, that he made out the location, and he believes the distance was guessed at by the company after riding from the tree to the licks.
There are other witnesses, who agree in proving the distance from Hinkston to the licks, to have been computed at about nine or ten miles, but John Grant who appears to have settled in Grant’s station some years before the date of the entry, says the computed distance was twelve miles, and several others support his statements. Giving weight to all the evidence, it must be conceded that different, sentiments prevailed with different persons, as to the distance, resulting probably from the various opinions, which each formed from travelling the road; but taking all into connexion it cannot be admitted that at the date of the entry; the distance from the licks, to Hinkston was generally , computed by those conversant in that part of the country, at nine or ten miles.
Upon the whole, we are of opinion, the entry of Haw's cannot be sustained, and that of Halbert, &c. is a valid one.
The decree of the circuit court in favor of the appellees must therefore be affirmed with costs.

Absent, Judge Mills.